UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:22-cr-530 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| DEANDRE MILLS, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Defendant Deandre Mills ("Mills") seeks suppression of all evidence seized by police during a traffic stop on March 10, 2022, as well as any statements Mills made while in police custody. (Doc. No. 17 (Motion to Suppress).) Plaintiff United States of America (the "government") opposes the motion. (Doc. No. 18 (Response); Doc. No. 23 (Supplemental Response).) The Court conducted an evidentiary hearing on the motion on March 29, 2023, and, at the conclusion of the hearing, the Court took the matter under advisement. For the foregoing reasons, Mills' motion is DENIED.

### I. BACKGROUND

During the evidentiary hearing, the government presented the testimony of several law enforcement officers who participated in the events that unfolded on March 10, 2022. Detective Brent Barbe is employed by the Cuyahoga Falls Police Department where he serves in the Narcotics Unit. He is also a member of the Federal Bureau of Investigation's ("FBI") Safe Streets Task Force. He testified that he and other members of the task force were performing undercover surveillance of a house on Inman Street in Akron, Ohio, believed to be the site of ongoing drug

trafficking. Through this surveillance, Detective Barbe regularly observed Mills, a frequent visitor to the premises, carrying a red, white, and black Nike bag in and out of the house. On March 10, 2022, task force officers observed short-term traffic—individuals entering the premises for a short period of time and then leaving—at the residence. From his training and experience, Detective Barbe believed this activity was indicative of drug trafficking. Given this recent activity at the house, Detective Barbe was interested in performing some traffic stops of individuals leaving the premises in order to develop probable cause to obtain a search warrant.

Late in the afternoon, Detective Barbe observed Mills exit the residence though the side door carrying the aforementioned Nike bag and drive away in a black vehicle. Mills was accompanied by a second man, later identified as Drew Woods, who was seated in the front passenger seat of the vehicle. Detective Barbe followed Mills at a distance in his unmarked police vehicle. He enlisted the assistance of Detectives Zachary Magaw and James Alexander, who were members of the Akron Police Department assigned to the Gun Violence Unit and were patrolling the general area in a marked police cruiser, to initiate the stop. As Detectives Magaw and Alexander made their way to Detective Barbe's location, Detective Barbe observed Mills' vehicle approach the intersection of Brown Steet and Exchange Street in the right lane.

The parties dispute what happened next. Detective Barbe testified he observed Mills move into the left turn lane without using his turn signal and cut off another vehicle already in the left lane that was waiting at the stop bar for the light to change. When Mills came to a stop in the left lane, his vehicle was positioned in front of the stop bar. According to Detective Barbe, the left turn into the left lane without a signal and the stop in front of the stop bar each constituted a separate violation of Akron traffic ordinances, and he radioed this information to Detectives Magaw and

2

Alexander.

Woods (Mills' passenger) testified that Mills used his left turn signal to enter the left turn lane, after he was waived ahead by the car stopped at the intersection waiting to turn left. Woods did not, however, offer any testimony regarding the final positioning of Mills' vehicle at the intersection vis-à-vis the stop bar.

When Detectives Magaw and Alexander arrived at the intersection in their cruiser, they observed Mills commit what they believed were two additional traffic violations. Specifically, the detectives testified consistently that they saw Mills (1) turn left onto Exchange Street directly into the far lane and then (2) immediately move from the far lane to the inside lane without using a turn signal. Detective Alexander turned on his overhead lights and siren to initiate a traffic stop, at which time Mills returned his vehicle to the right lane before bringing the car to a complete stop. Again, Woods offered a slightly different account, suggesting that Mills turned into the inside lane before getting over into the outer lane. He further testified that once Mills was through the intersection, he transitioned to the right lane before he legally parked the vehicle in front of a convenience store. According to Woods, he never saw the cruiser's overhead lights or heard a police siren.

There is no dispute, however, that Detectives Alexander and Magaw parked behind Mills' car, exited the cruiser, and approached on foot with Detective Alexander approaching from the drivers' side of Mills' vehicle and Detective Magaw advancing from the passenger's side. Both detectives immediately noticed a strong smell of marijuana emanating from Mills' vehicle. Once they reached the car, they observed in plain view the remains of burnt marijuana in a lime green cup in the cup holder in front of the console and a scale, which the detectives suspected was

3

connected with drug trafficking. Photographs of the cup with the burnt marijuana and the scale were introduced during the hearing. (Gov. Exs. 6, 7, 8.) Detective Alexander also noticed that Mills was hunched over the Nike bag that he had at his feet. He testified that he found this behavior suspicious, as motorists do not usually drive with bags between their feet because any bag would interfere with the driver's access to the gas and brake pedals.

The detectives ordered the two men out of the vehicle and performed a pat down search for weapons. Detective Alexander then informed Mills of the traffic violations and explained that they were going to search the vehicle because it smelled like marijuana. When Detective Alexander opened the drawstring of the Nike backpack, he saw a jar containing more marijuana and the handle of a firearm with an ammunition magazine extending from it. As Detective Alexander approached Mills to place him in handcuffs, Mills fled the scene. The detective gave chase, at which point other members of the Akron Police Department joined in the search and eventually apprehended Mills. Officers placed Mills in the back of a police cruiser belonging to Officers Travis Seeley and Warrick because it had a secure cage in the back seat. Officers Seeley and Warrick proceeded to take Mills back to the scene of the traffic stop.

A search of Mills' vehicle yielded a large bag of marijuana located inside the center console. Additionally, when Mills' Nike bag was thoroughly searched, officers discovered a second weapon, a jar containing a substance later confirmed to be methamphetamine, and another large bag of marijuana.[1] Photographs of the inside of the center console and the contents of the Nike bag were offered and admitted into evidence during the hearing. (Gov. Exs. 9, 10.) Detective Alexander informed Officer Warrick that Mills was going to be taken into custody on drug charges.

---

[1] During a subsequent inventory search of Mills' vehicle, officers located additional illegal drugs in the trunk.

He instructed Officer Warrick to apprise Mills of his *Miranda*[2] rights and return him to the Inman Street residence where a search of the premises would be conducted.

Officer Warrick read Mills his *Miranda* rights at 6:07 p.m., and the recitation of these rights was captured on the officer's body camera, which was played at the hearing. (*See* Gov. Ex. 1.) In the video recording, Officer Warrick can be seen reading from a card that contained a list of a defendant's *Miranda* rights. Mills indicated that he understood the nature of these rights, but asked why they were being read to him at this time. Officers Warrick and Seeley explained to Mills that he was being arrested on drug charges. They further explained that they would be transporting him back to the Inman Street residence where officers were going to obtain a warrant in order to conduct a search prompted, in part, by what officers discovered in Mills' vehicle. (*See id*.)

As they transported Mills to the Inman Street address, Mills voluntarily engaged the officers in conversation. Because Officer Warrick eventually muted his body camera to take a personal call, Officer Seeley turned on his body camera to record the conversation. (Gov. Ex. 2.) From Officer Seeley's recording, Mills appeared calm and at ease. He was cordial and respectful when interacting with the officers, and he volunteered information regarding the traffic stop, the contents of his bag, and the chase that led to his eventual apprehension.[3] (*Id*.)

Once Officers Seeley and Warrick arrived with Mills at the Inman Street residence, the officers joined in the residential search that was already underway. Mills remained in handcuffs locked in the back of the cruiser. At approximately 9:00 p.m., Detective Barbe and his partner

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 446–50, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] For example, Mills casually advised the officers that he both knew and did not know what was in his Nike bag. When it was clear that his bag was going to be searched, Mills told officers that he decided it was "game time" and he ran. Mills and the officers even shared a laugh over the details surrounding the chase.

approached the police cruiser in order to interview Mills to see if he was interested in cooperating with the investigation. A recording of this interview was introduced at the hearing. (Gov. Ex. 3.) Having been advised by Detective Magaw that Mills had previously been *Mirandized*, Detective Barbe elected not to re-read Mills his rights. Instead, he asked Mills if he was advised of his *Miranda* rights. Mills indicated that he was read his rights when he was arrested and that he understood them. (*Id.*)

The interview lasted approximately nine and one-half minutes. At the outset, Detective Barbe and his partner asked Mills if he was interested in speaking with them. They explained that it would be in his best interest to cooperate now before the state charges became more serious or before the prosecutor decided to pursue federal charges. Nevertheless, Detective Barbe made it clear that it was Mills' choice, and that, if he did not want to speak with them, it was "cool." Mills inquired as to the basis for the traffic stop, asking if it was a "regular traffic stop." Detective Barbe explained that while he was pulled over on a traffic violation, there was a reason why the officers were now back at the Inman Street residence executing a search warrant. The detectives explained that police had been surveilling the residence for some time for drug activity. Mills asked some questions regarding the scope of the investigation and volunteered some general information regarding his presence in the Inman Street address. Mills ultimately advised the detectives that he was prepared to accept responsibility for the contents of the car but that he had no information regarding any drug activity taking place at the Inman Street residence. During the course of the brief interview, neither detective threatened Mills nor made him any promises. The limited verbal exchange they had with Mills was casual, and Mills did not at any time appear to be in distress.

Mills was eventually charged in federal court with one count each of possession with intent

to distribute methamphetamine, being a felon in possession of firearms and ammunition, and possession of a firearm in furtherance of a drug trafficking offense. (Doc. No. 10 (Indictment).) Detective Magaw also issued Mills a citation for turning without using a turn signal, in violation of the City of Akron Traffic Ordinance 72.15. (Gov. Ex. 11.)[4]

## II. DISCUSSION

### A. The Initial Traffic Stop Was Lawful

It is well-settled that an officer has probable cause under the Fourth Amendment to stop a vehicle when he observed a driver violate a traffic law. *United States v. Hughes*, 606 F.3d 311, 315–16 (6th Cir. 2010). The officer's internal motivation is irrelevant, [s]o long as the officer had probable cause to believe that a traffic violation occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993).

Here, Detectives Barbe, Alexander, and Magaw collectively testified credibly to at least four[5] traffic violations committed by Mills before he was stopped by law enforcement. Each violation could have independently supported the stop. *See United States v. Burton*, 334 F.3d 514, 517 (6th Cir. 2003); *see also United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012) ("It is

---

[4] There are two distinct sets of handwriting appearing on the citation. Detectives Alexander and Magaw testified consistently that Detective Alexander filled out the top portion of the citation, while Detective Magaw filled in the bottom portion, including the box that included the actual Akron City ordinance that was violated. Detective Alexander explained that he started to fill out the ticket but was pulled away from the task and asked Detective Magaw to finish filing it out. While Detective Alexander had intended to cite Mills for illegally turning left into the far lane, Detective Magaw elected to cite Mills for failing to use his turn signal. Detective Magaw explained that Mills could have been cited for either violation (or for both) and that the process of selecting from various violations is left to the discretion of the officer issuing the citation.

[5] As set forth above, the violations were: (1) moving in the intersection from the right lane to left turn lane without signaling; (2) stopping in the left turn lane in front of the stop bar; (3) turning left at the intersection into the far lane; and (4) moving from the far lane to the inner lane without signaling.

well-established that an officer may conduct a stop based on information obtained by fellow officers." (citing cases endorsing the "collective knowledge" or "fellow officer" doctrine)). While Mills complains that the officers offered conflicting testimony regarding some of the details surrounding these infractions, the Court found their testimony to be largely consistent and corroborative. Moreover, given the passage of time, any minor inconsistencies that may have existed between these accounts did not render the witnesses' testimony incredible. *See United States v. Jones*, 364 F. App'x 205, 208 (6th Cir. 2010) (upholding district court's denial of a suppression motion despite minor discrepancies between officer accounts); *see, e.g., United States v. Mathis*, 653 F. Supp. 2d 806, 816 (E.D. Tenn. 2009) (adopting the report and recommendation recommending the denial of a motion to suppress and finding minor potential inconsistences and memory lapses did not render a witness' testimony incredible).

The Court, however, found the testimony of the passenger, Woods, to be less than credible. On the stand, Woods' answers appeared rehearsed, and his account of the events lacked plausibility. For example, notwithstanding the undisputed existence of two large bags of marijuana in the front seat of the vehicle near the passenger seat, and remnants of burnt marijuana in the cupholder between the driver and passenger, Woods testified that he did not smell *any* marijuana in the vehicle. Other aspects of Woods' testimony did not ring true. Woods testified that he never noticed the lights and siren from the police cruiser parked immediately behind Mills' vehicle before he exited the vehicle to go and cash a check in the convenience store. He further claimed that before he could reach the store the officers, whom he had not noticed, ordered him back into the car before they removed him again from the vehicle moments later to perform the pat down search. The Court chooses not to endorse this improbable and conveniently sanitized account of

the events.⁶

### B. The Continuation of the Traffic Stop and Search Were Lawful

Police activities during an investigatory stop must be reasonably related to the circumstances that initially justified the stop. *See United States v. Sharpe*, 470 U.S. 675, 682, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985); *Dorsey v. Barber*, 517 F.3d 389, 398 (6th Cir. 2008) (quotation marks and citation omitted). During the investigatory stop, police may ask questions or request documents to establish a person's identity and to confirm or dispel suspicions of criminal activity. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). Additionally, as part of the stop, officers may order the occupants of the vehicle out of the car while the investigatory stop is underway. *Maryland v. Wilson*, 519 U.S. 408, 410, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997). However, "'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. Davis*, 430 F.3d 345, 357 (6th Cir. 2005) (quoting *Fla. v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)).

"Once the purpose of an ordinary traffic stop is completed, [officers] may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention. *United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)). "Reasonable suspicion requires specific and articulable facts, which, taken together with rational

---

⁶ Of course, even if the Court elected to credit Woods' testimony *in toto*, the fact remains that Woods did not deny that Mills stopped at the intersection in front of the stop bar. Further, while he testified that Mills used his turn signal to move in front of the vehicle that had allegedly gestured to him to move ahead, Woods never testified that Mills used his turn signal to actually turn left at the intersection onto Exchange Street. Thus, Woods' testimony in no way undermines the existence of two of the four identified violations.

inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). To determine whether an officer has reasonable suspicion to further detain a vehicle or its occupants, the Court must analyze the totality of the circumstances. *Smith*, 263 F.3d at 588.

Here, the Court credits the testimony of the detectives who claimed they smelled marijuana as they approached the vehicle, which, alone, provides a sufficient reason to prolong the stop. *See United States v. Stevenson*, 43 F.4th 641, 648 (6th Cir. 2022) (noting that "[o]ur court has long held that officers have the required probable cause when they detect the odor of illegal marijuana coming from the vehicle" (quotation marks and citation omitted)). The burnt marijuana and scale, both visible in plain view, along with Mills' decision to run, provide further support for the continuation of the stop. *See id*. ("So the smell of marijuana . . . or the discovery of marijuana, itself—pick any—gave [the officer] probable cause to continue searching the entire car for marijuana . . . ."); *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (even if the initial purpose of the stop was complete, police may extend beyond the original purpose if "something happened during the stop to cause the officers to have a reasonable and articulable suspicion that criminal activity is afoot").

In light of Mills' multiple traffic violations and the events that quickly unfolded immediately after law enforcement initiated the traffic stop, neither the stop nor its continuation and search of the vehicle present reasons to suppress the evidence discovered during the stop.

### C. Defendant Was Properly *Mirandized* and There Was No Need to Repeat the Warnings

Mills also seeks to suppress the statements he made while in police custody. Under

*Miranda*, before questioning suspects in custody, law enforcement officials must inform suspects that (1) they have the right to remain silent, (2) their statements may be used against them at trial, (3) they have the right to the presence of an attorney during questioning, and (4) if they cannot afford an attorney, one will be appointed for them. *Miranda*, 384 U.S. at 446–50; *see also Fla. v. Powell*, 559 U.S. 50, 60, 130 S. Ct. 1195, 175 L. Ed. 2d 1009 (2010) ("The four warnings *Miranda* requires are invariable[.]") No additional warning is required. *See Missouri v. Seibert*, 542 U.S. 600, 608–09, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). Warnings need not be given in the exact language of the *Miranda* opinion, but *Miranda's* essential message must be conveyed under procedures "at least as effective [as *Miranda* warnings] in apprising accused persons of their [rights] and assuring a continuous opportunity to exercise [them]." *Miranda*, 384 U.S. at 467; *see Powell*, 559 U.S. at 60.

Mills does not take issue with the initial reading of the *Miranda* warnings by Officer Warrick, nor has he suggested that his initial waiver of these rights was in any way coerced. And, in any event, the Court finds that the government' evidence, including the recordings from the officers' body cameras, demonstrates that Mills was properly advised of his rights and that he voluntarily, knowingly, and intelligently waived those rights. *Colo. v. Connelly*, 479 U.S. 157, 168, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *see Miranda*, 384 U.S. at 475; *Garner v. Mitchell*, 557 F.3d 257, 265–66 (6th Cir. 2009). Mills' contention lies in the fact that the reading of his rights was not, in his opinion, "reasonably contemporaneous" with the interview eventually conducted by Detective Barbe and his partner. (Doc. No. 17, at 3.) Specifically, Mills claims that the gap of three hours between the time Officer Warrick read him his rights and the custodial interview after the residential search was complete invalidated his waiver. (*Id.*)

"The courts have generally rejected a *per se* rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997) (quotation marks and citation omitted); *see also Berghuis v. Thompkins*, 560 U.S. 370, 386, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) ("Police are not required to rewarn suspects from time to time" regarding their *Miranda* rights). Instead, once a defendant has been properly advised of his constitutional rights, "additional warnings are only required if the circumstances seriously changed between the initial warning and the interrogation."[7] *Treesh v. Bagley*, 612 F.3d 424, 432 (6th Cir. 2010) (citing *Wyrick v. Fields*, 459 U.S. 42, 47, 103 S. Ct. 394, 74 L. Ed. 2d 214 (1982)). The analysis takes into consideration the totality of the circumstances. *Id*. at 431 (citing *Weekley*, 130 F.3d at 751–52).

In *Treesh*, two hours passed between the time defendant was read his rights and the custodial interrogation, during which defendant was taken from the scene of the arrest to the local jail. Prior to the start of the investigation, the officer partially readvised defendant of his rights. The Court concluded that the waiver was still voluntary. The court in *Treesh* cited with favor other courts finding a waiver valid where there was no reason to believe that defendant no longer understood his rights. *See id*. (citing, among authority, *United States v. Clay*, 408 F.3d 214, 222 (5th Cir. 2005) (no need for re-warning where there was no evidence that the suspect no longer understood the warnings or did not understand their applicability to the interrogation that occurred two days after initial warning); *Evans v. McCotter*, 790 F.2d 1232, 1237–38 (5th Cir. 1986) (rights voluntarily waived where suspect was twice advised of rights over a three-hour period

---

[7] Accordingly, counsel's suggestion at the hearing that Mills should have been *re-Mirandized* because "there was time" to do so does not accurately state the law or provide the standard the Court must employ.

notwithstanding a change of interview locations); *Stumes v. Solem*, 752 F.2d 317, 320 (8th Cir. 1985) (five-hour interval between first and second interviews did not invalidate suspect's waiver given before the first interview); *Jarrell v. Balkom*, 735 F.2d 1242, 1254 (11th Cir. 1984) (change in interrogators and three-hour lapse did not render confession inadmissible); *United States v. Fike*, 563 F.2d 809, 814 (7th Cir. 1977) (nine hours between warnings and waiver was not too long)).

In the present case, the totality of the circumstances does not support a finding that Detective Barbe was required to re-read Mills his rights before he was interviewed. There is no question that Mills understood his rights when they were read by Officer Warrick and that he had voluntarily agreed to waive those rights and speak with members of law enforcement.

During the three hours that followed, Mills remained in the same cruiser. And while Mills was transferred to two different locations, each one was familiar to Mills and directly relevant to the events that resulted in his arrest. The first location was the site of Mills' traffic stop (and Mills' return was only made necessary by Mills' choice to flee the scene), and the second stop was the Inman Street residence that Mills had exited earlier that evening. Officers Warrick and Seeley explained to Mills that he was being transported back to the Inman Street residence because the evidence found in his car during the traffic stop had prompted a search of the residence. This fact was confirmed by Detective Barbe, who explained why he wanted to speak with Mills. Moreover, before Detective Barbe attempted to interrogate him, he confirmed that Mills still understood his rights, which Mills remembered were read to him at the time of his arrest. Detective Barbe also reminded Mills that the choice to speak with them was his (Mills'). As was the case in *Treesh*, there is nothing about the intervening circumstances that divested Mills of the knowledge or belief that he could still invoke his *Miranda* rights. *See Treesh*, 612 F.3d at 429–32. Accordingly, the

13

lack of any new *Miranda* warnings does not provide a basis for suppressing the resulting custodial statements.

### III. CONCLUSION

For the foregoing reasons, Mills' motion to suppress is DENIED.

**IT IS SO ORDERED**.

Dated: May 17, 2023

**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**